DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Demetrius M. Williams has appealed from his convictions of complicity to the offense of possession of cocaine, with attached firearm specification, and complicity of the offense of illegal use or possession of drug paraphernalia. This Court affirms.
 I {¶ 2} Appellant was arrested on June 25, 2003, in a house located on 708 Raymond Street, in Akron, Ohio. While Appellant and other occupants of the home were being arrested, the police searched the home and found illegal drugs, drug paraphernalia, and weapons. On July 8, 2003, Appellant, along with Marie Tate and Terrell Riley, were indicted by the Summit County Grand Jury on one count of possession of cocaine, in violation of R.C.2925.11, with attached firearm specification, in violation of R.C. 2941.141; one count of illegal use or possession of drug paraphernalia, in violation of R.C. 2925.14(C)(1); one count of possession of marijuana, in violation of R.C. 2925.11; and one count of having weapons while under disability, in violation of R.C. 2923.13(A)(2) and (A)(3), with attached firearm specification, in violation of R.C. 2941.141. Appellant pleaded not guilty to the crimes as charged in the indictment and the matter proceeded to a jury trial; Mr. Riley was a co-defendant at the trial. The State moved to dismiss the charge of having weapons while under disability, with the attached firearm specification, and the trial court granted the motion.
 {¶ 3} After the State rested, the trial court granted the State's motion that the jury be given a complicity instruction for each of the remaining charges. The jury returned a guilty verdict on the crimes of complicity to the offense of possession of cocaine, with attached firearm specification, and complicity of the offense of illegal use or possession of drug paraphernalia.[1] Appellant was found not guilty of the crime of possession of marijuana. The trial court sentenced Appellant to a term of one year of imprisonment for the possession of a firearm and a term of six years imprisonment for the crime of complicity to the offense of possession of cocaine. Appellant was not sentenced for the crime of illegal use or possession of drug paraphernalia because the crime merged with the crime of complicity to the offense of possession of cocaine. The sentences were ordered to run consecutively to each other.
 {¶ 4} Appellant has timely appeal, asserting two assignments of error.
 II Assignment of Error Number One
"The state's pervasive misconduct during the course of [appellant's] entire trial merits either a reversal of appellant's convictions or a new trial."
 {¶ 5} In Appellant's first assignment of error, he has argued that this Court should reverse his convictions, or in the alternative grant a new trial, as a result of the State's prosecutorial misconduct. This Court disagrees.
 {¶ 6} The Supreme Court of Ohio has limited the instances when a judgment may be reversed on grounds of prosecutorial misconduct. See State v. Lott (1990), 51 Ohio St.3d 160, 166, certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591,112 L.Ed.2d 596. The analysis of cases alleging prosecutorial misconduct focuses on the fairness of the trial and not the culpability of the prosecutor. Id. A reviewing court is to consider the trial record as a whole, and is to ignore harmless errors "including most constitutional violations." Id., quotingUnited States v. Hasting (1983), 461 U.S. 499, 508-509,103 S.Ct. 1974, 76 L.Ed.2d 96, certiorari denied (1985),469 U.S. 1218, 105 S.Ct., 84 L.Ed.2d 343. Accordingly, a judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial. State v. Carter
(1995), 72 Ohio St.3d 545, 557, citing State v. Apanovitch
(1987), 33 Ohio St.3d 19, 24.
 {¶ 7} In the instant matter, Appellant has argued that the State committed prosecutorial misconduct when it failed to abide by the discovery rules. Specifically, Appellant has argued that the State failed to present certain evidence to Appellant before his trial commenced. Appellant has contended that the State failed to present the following evidence to him prior to trial: 1) information concerning whether Appellant had been previously convicted of a felony; 2) evidence reports from the Bureau of Criminal Identification and Investigation ("BCI") that would have shown that no fingerprint evidence linked Appellant to any of the evidence in the case; and 3) a Polaroid photograph that would have linked the shotgun to its alleged owner, Ms. Tate. Appellant has contended that the State's failure to provide him with this evidence prevented him from having a fair trial.
 {¶ 8} In reviewing prosecutorial violations of the discovery rule, this Court looks at the Ohio Supreme Court decision inState v. Joseph (1995), 73 Ohio St.3d 450, certiorari denied (1996), 516 U.S. 1178, 116 S.Ct. 1277, 134 L.Ed.2d 222. InJoseph, the court explained that the State's failure to provide discovery will not amount to reversible error unless there is a showing that "(1) the prosecution's failure to disclose was a willful violation of [Crim. R. 16], (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." (Alterations sic.) Id. at 458, citing State v. Parson
(1983), 6 Ohio St.3d 442. Assuming, without deciding, that the State willfully violated the discovery rules, this Court finds that Appellant has failed to satisfy the three-part test set forth in Joseph. That is, he has failed to demonstrate that foreknowledge of the existence of the evidence would have benefited him or that he suffered prejudice as a result of the State's failure to provide him with the evidence.
 {¶ 9} In his appellate brief, Appellant has only contended that the State failed to provide him with certain evidence, however, he has failed to explain the importance of the evidence and the impact that the loss of such evidence had upon him. Appellant has claimed that a Polaroid photograph of another defendant, Ms. Tate, holding a shotgun was somehow vital to his defense. He has contended that the photograph "would have linked the shotgun not to Appellant, but to its true owner-Marie Tate." This Court finds that even if Appellant was provided with the photograph prior to trial, it would not have benefited his defense. Based on the testimony of the arresting officers, the photograph would have simply shown a picture of Ms. Tate holding an unidentified shotgun. Appellant has failed to argue or demonstrate that the shotgun shown in the photograph was the same shotgun confiscated from the house located on 708 Raymond Street.
 {¶ 10} This Court further notes that Appellant was able to cross-examine the State's witnesses concerning the BCI evidence reports. The State called two BCI employees as witnesses. During cross-examination of these witnesses, Appellant was able to discuss whether the firearms and drug paraphernalia confiscated from the house located on 708 Raymond Street contained Appellant's fingerprints. The answers elicited from the witnesses informed the jury that Appellant's fingerprints were not found on the weapons or drug paraphernalia tested. Because Appellant was able to discuss the contents of the BCI reports by cross-examining the witnesses that created the reports, and he has failed to show what he would have done differently if he had the BCI reports before the trial started, we cannot say that Appellant was prejudiced by the State's alleged failure to produce such evidence before the trial commenced.
 {¶ 11} With regard to the State's alleged failure to provide Appellant with a copy of his prior arrest record, this Court notes that the prosecution, after voir dire, moved to dismiss the charge of having weapons while under disability, with attached firearm specification, against both Appellant and his co-defendant, Mr. Riley. The trial court granted the motion. Thus, the State's alleged failure to produce Appellant's prior arrest record did not prejudice him.
 {¶ 12} Appellant has further argued that the State made improper comments during closing arguments, and that such comments prejudiced him. Specifically, Appellant has pointed to the State's statement that the jury should make a "`fair inquiry' and `let [the defense] tell you' how Appellant was innocent." The record reveals that during closing arguments the State made the following comments:
"Ladies and gentleman, I have proven my case beyond a reasonable doubt. The detectives have presented sufficient evidence that — of witnesses and evidence and witnesses we put on here to convince you beyond a reasonable doubt.
"When I sit down the defense is going to get up and tell you that I didn't do that.
"Let them explain to you what happened about the first story. Let them explain to you how Marie [Tate] called [Appellant]. Let them tell you why the stories changed, ladies and gentlemen.
"Let them tell you where the girlfriend is that could show that this is truthful testimony.
"Let them tell you where the letters are from Verondia [Moss]. Let them tell you where all of these other things are. It's [a] fair inquiry. It's [a] fair inquiry. It's not commenting or trying to change the burden that I accept."
 {¶ 13} This Court first notes that Appellant has mischaracterized the comments made by the State. The State did not maintain, as Appellant has alleged, that the burden was on Appellant to prove his innocence. Rather, the State simply asked the jury to review all the claims presented by the defense and determine whether the defense supported those claims with relevant and material evidence. However, regardless of whether the State's comments during closing argument shifted the burden of proof, this Court finds that Appellant has waived this argument on appeal. Although Mr. Riley's trial counsel timely objected after the State made these comments, the record shows that Appellant's trial counsel did not object. As pointed out by the State in their appellate brief, this Court has held that a co-defendant's objection does not preserve this issue on appeal.State v. Watkins, 9th Dist. No. 21101, 2003-Ohio-1305, at ¶ 26. Consequently, Appellant's argument regarding comments the State made during closing argument is waived and this Court declines to address the merits of that argument.
 {¶ 14} For the foregoing reasons, we find that Appellant was not deprived of a fair trial as a result of the State's actions or inaction. As such, Appellant's first assignment of error is not well taken.
 Assignment of Error Number Two
"Appellant's convictions for complicity to cocaine possession and complicity to possession of drug paraphernalia are against the manifest weight of the evidence."
 {¶ 15} In Appellant's second assignment of error, he has argued that his convictions were against the manifest weight of the evidence. This Court disagrees.
 {¶ 16} In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 17} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. State v. Thompkins (1997),78 Ohio St.3d 380, 387. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. Id.
 {¶ 18} In the case sub judice, Appellant was convicted of complicity to the offense of possession of cocaine, a violation of R.C. 2923.03 and R.C. 2925.11. Ohio's complicity statute provides, in pertinent part:
"(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
"(1) Solicit or procure another to commit the offense;
"(2) Aid or abet another in committing the offense;
"(3) Conspire with another to commit the offense in violation of [R.C. 2923.01];
"(4) Cause an innocent or irresponsible person to commit the offense." R.C. 2923.03(A).
 {¶ 19} "To aid is to assist." State v. Sims (1983),10 Ohio App.3d 56, 58. The Ohio Supreme Court has stated that in order to prove that a person aided or abetted another in committing a crime, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime." State v. Johnson
(2001), 93 Ohio St.3d 240, syllabus. Further, the State must present evidence that demonstrates that the defendant expressed concurrence with the unlawful act or intentionally did something to contribute to an unlawful act. State v. Stepp (1997),117 Ohio App.3d 561, 568.
 {¶ 20} R.C. 2925.11 provides: "(A) No person shall knowingly obtain, possess, or use a controlled substance." R.C. 2925.11. The term "possess" is statutorily defined as "having control over a thing or substance." R.C. 2925.01(K). Possession may "not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which thing or substance is found." Id. This Court has held that "a person may knowingly possess a substance or object through either actual or constructive possession." State v. Hilton, 9th Dist. No. 21624, 2004-Ohio-1418, at ¶ 16, citing State v. McShan (1991),77 Ohio App.3d 781, 783. A person may constructively possess a substance or object if he "`knowingly exercis[es] dominion and control over an object, even though that object may not be within his immediate physical possession [,]' or [if he has] knowledge of the presence of the object." (Alterations added.) Hilton,
2004-Ohio-1418, at ¶ 16, quoting State v. Hankerson (1982),70 Ohio St.2d 87, syllabus, certiorari denied (1982), 459 U.S. 870,103 S.Ct. 155, 74 L.Ed.2d 130.
 {¶ 21} Appellant was convicted of a firearm specification that was attached to the charge of complicity to the offense of cocaine possession, a violation of R.C. 2941.141. That section provides that at the time of the commission of the crime, the defendant "had a firearm on or about the [defendant's] person or under the [defendant's] control while committing the offense." (Alterations added.) R.C. 2941.141(A).
 {¶ 22} Appellant was also convicted of complicity to the offense of illegal use or possession of drug paraphernalia, a violation of R.C. 2923.03 and R.C. 2925.14(C)(1). R.C.2925.14(C)(1) provides, in pertinent part: "No person shall knowingly use, or possess with purpose to use, drug paraphernalia."
 {¶ 23} Appellant has argued on appeal that his convictions for complicity to the offense of cocaine possession, with attached firearm specification, and complicity to the offense of illegal use or possession of drug paraphernalia were against the manifest weight of the evidence because "the only physical evidence connecting Appellant to anything in [the home located at 708 Raymond Street] was Appellant's presence on the premises." He has further argued that:
"[T]he only testimony linking Appellant to drugs [found in the house located on 708 Raymond Street] came from an addict who admitted she was so addled from smoking crack cocaine all day on June 25, 2003, that she could not give a police statement during the raid * * * and from a co-defendant who admitted she was not at [the house located on 708 Raymond Street] enough to know what was going on in her house, and who, as a part of a plea bargain, agreed to testify in exchange for probation."
 {¶ 24} After reviewing the entire record, this Court finds Appellant's arguments without merit. At trial, the State presented ample evidence to convict Appellant for complicity to the offense of cocaine possession, with attached firearm specification, and complicity to the offense of illegal use or possession of drug paraphernalia.
 {¶ 25} Alease Fleming, a witness for the State, testified to the following. She was renting a house located at 708 Raymond Street ("Raymond Street house"), in Akron, Ohio. She moved into the Raymond Street house in April 2003, with her girlfriend, Verondia Moss. A couple of months later, a woman named Marie Tate[2] and a man by the name of "Harry," who was also called "Slim," moved into the home. Ms. Fleming testified that "Slim" was Ms. Tate's boyfriend and a drug dealer from Detroit. Another man named "Tommy" also moved into the home. "Tommy" worked for "Slim" as "the doorman[.]" As the "doorman," Tommy watched the door of the Raymond Street house and when a customer knocked at the door of the home, Tommy would let them in, "get
the money [for the drugs] and take it upstairs and get the drugs."
 {¶ 26} In the summer of 2003, "Slim" left the home and sent "two Detroit boys" to replace him at the Raymond Street house. The two men that replaced "Slim" were Appellant and his co-defendant, Mr. Riley; Ms. Fleming occasionally referred to Appellant and his co-defendant as "J" and "E." Ms. Fleming testified that when Appellant and Mr. Riley arrived at the Raymond Street house they began to sell drugs, specifically crack cocaine, along with Ms. Tate. Ms. Fleming stated that Appellant and his co-defendant received the drugs from a "guy named Jerry" and Ms. Tate, who the witness occasionally referred to as "Re[.]" The witness further explained that after moving into the Raymond Street house, Appellant and his co-defendant began to "run things. One of them hit [her] in the mouth, so they try to change things around like, you know, like change the rules or whatever[.]" Ms. Fleming also testified that sometimes Appellant and Mr. Riley would carry guns inside of socks; she explained that they carried the guns inside of socks to wipe away any fingerprints.
 {¶ 27} On June 25, 2003, Ms. Fleming was at the Raymond Street house when the Akron police executed a search warrant on the premises. When the police arrived, she was downstairs and Appellant and Mr. Riley were upstairs. Ms. Fleming was arrested and handcuffed. Ms. Fleming also explained to the jury that the two men lived in the front bedroom of the house, or the southeast bedroom, which contained a television. During direct examination the prosecution showed Ms. Fleming photographs of the television located in the southeast bedroom; the television was found next to a plate containing crack cocaine and a baggie of marijuana. Ms. Fleming acknowledged that the television in the photographs was the same television Appellant and Mr. Riley kept in their room. Ms. Fleming further explained that she stayed in the back room of the house, where "[t]he other guns, shotguns" were located. According to Ms. Fleming, the weapons belonged to Appellant and Mr. Riley. Appellant and Mr. Riley eventually told Ms. Fleming that she could no longer stay in her bedroom because the weapons were housed in that room.
 {¶ 28} Ms. Fleming admitted that on the day she and Appellant were arrested she had been using "[a] lot" of crack cocaine. She believed that despite her drug use on the day of the raid, her perception was not impaired. Ms. Fleming further admitted that she allowed Ms. Tate to move into her home and sell crack cocaine because Ms. Tate gave Ms. Fleming crack cocaine in exchange for rent money. She denied that Ms. Tate asked Appellant and Mr. Riley to come to Akron to help complete some repair work on the Raymond Street house or another house located at 696 Raymond Street.
 {¶ 29} Verondia Moss, Ms. Fleming's roommate, testified for the State. Ms. Moss explained that she was currently serving time in the Summit County jail for the crime of permitting drug abuse in connection with the raid that occurred on June 25, 2003. She explained that she moved into the house in March 2003, and Ms. Fleming moved in later. She further explained that Appellant, Mr. Riley, Ms. Tate and "Slim" moved into her home, and while there they sold drugs. Ms. Moss testified that she "lost control of everything" when Appellant and Mr. Riley moved into her home. She stated that she tried to "get them out of [her] house several times" but they would not leave. Ms. Moss also testified that she saw weapons on the bedroom floors; however, she never saw Appellant or his co-defendant in possession of the weapons. Ms. Moss was not present when the house was raided on June 25, 2003. After the raid, however, she talked to Detective Allen Jones.
 {¶ 30} On cross-examination, Ms. Moss admitted that she pleaded guilty to a felony conviction in return for probation. She stated, however, that in exchange for probation she "would testify to the truth * * * [.]" She also admitted that "she didn't know what was going on at the house" because she was rarely around. She denied that she knew anything about Appellant and Mr. Riley visiting Akron to help Ms. Tate repair a house that Ms. Tate intended to buy on Raymond Street. Ms. Moss also denied that Appellant, Mr. Riley, or Ms. Tate kept tools in her house with the intent of repairing another house.
 {¶ 31} The State presented testimony from two BCI employees: Messrs. Andy Chappell and Robert Michael Velten. Mr. Chappell, a forensic scientist assigned to the firearms section at BCI, testified that he was asked to examine three revolvers (a Smith 
Wesson brand revolver, a Taurus brand revolver, and a Colt brand revolver) and one shotgun (a J.C. Higgins brand shotgun) to determine if they were operable. Mr. Chappell tested the firearms and concluded that the Taurus brand revolver, the Smith Wesson brand revolver and the J.C. Higgins brand shotgun were in proper working order and capable of expelling a projectile. Mr. Chappell further stated that the Taurus and Smith Wesson revolvers were submitted to him along with unfired cartridges and socks. The witness further admitted that "to his knowledge" the guns and the cartridges were not tested for fingerprint or DNA analysis. The witness also admitted that he did not know the identity of the owners of the guns that he tested.
 {¶ 32} Mr. Velten, a lab analyst employed by BCI and an individual contractor with the Akron Police Department in their drug identification unit, conducted a chemical analysis of "a rock-like substance" given to him from the raid that occurred on June 25, 2003. He testified that the substance weighed 13.25 grams and was determined to be crack cocaine.
 {¶ 33} The police officers testifying on behalf of the State included: Sergeants Jason Malick and Gerald Forney, Detectives Ted Male, Michael Schmidt, Michael Gilbride, Allen Jones, and Officer Keith Meadows. The police officers were present when the Raymond Street house was raided.
 {¶ 34} Sergeant Malick, a police officer with the Street Narcotics Unit Detail ("SNUD Unit") on the Akron Police Department, explained that as a member of the SNUD Unit he "investigate[s] street level narcotics crimes, investigate[s] crack houses, street dealers, this type, things that are lower level that wouldn't require long-term investigation." He explained that the Raymond Street house had been under surveillance for weeks and a confidential informant had been used to conduct controlled buys on behalf of the police. Sergeant Malick testified that, as the person in charge of the search of the Raymond Street house, he was present when a SWAT team executed a search warrant on the home. When Sergeant Malick entered the home, he immediately saw Ms. Fleming and "took control of" her.
 {¶ 35} Reading from the inventory sheet created at the time items were confiscated from the Raymond Street house, Sergeant Malick testified that the following items were recovered during the raid: a .38 caliber Smith Wesson revolver, which was found in the stairwell of the home; a loaded .38 caliber Taurus revolver, which was found on the roof; a 12-gauge shotgun, which was found in the southwest bedroom; $610 in cash, which was found in Appellant's pants pocket; $482 in cash, which was found in Mr. Riley's pockets; 15.6 grams of crack cocaine, which was found in the southeast bedroom; a digital scale, which was found in the southeast bedroom; rounds of ammunition, which was found in the southeast bedroom; 14.2 grams of marijuana, which was found in the southeast bedroom; a walkie-talkie, which was found in the southeast bedroom; two grams of marijuana, which was found in the kitchen stove; four crack pipes, which was found in the dining room; Ms. Tate's identification card, which was found in the car located in the driveway; and one metal crack pipe, which was found in another party's pocket. Aside from the four crack pipes found in the dining room, Sergeant Malick explained that he had no personal knowledge of when the other items were found, who found the items, or the condition the items were in when they were found.
 {¶ 36} Sergeant Malick further testified that digital scales and walkie-talkies were generally used in the drug trade. The Sergeant explained:
"What happens is, usually drug dealers will get an amount of cocaine. In order to break it down to be able to sell it they'll weigh it, whether it be by pieces, by 8-balls, by ounces, they'll weigh on the digital scale, and that way they know what they're selling."
 {¶ 37} Walkie-talkies were used for "security purposes." The sergeant further explained that when he questioned Ms. Fleming, who the sergeant knew to "be a crack addicted person[,]" on the night of June 25th, she did not "appear to be impaired in any way[.]"
 {¶ 38} Sergeant Forney, who was also assigned to the SNUD Unit and the team leader for the SWAT operation on the night of June 25, 2003, initially searched the basement of the Raymond Street house when SWAT and SNUD officers entered the premises. He testified that when he searched the basement he did not find any tools that could be used for construction or repairing a roof. Sergeant Forney stated that as he was going up the stairs to search the second floor he found a sock with a .38 caliber Smith Wesson revolver inside of it. The officer immediately knew the sock contained a gun because, prior to the search, he learned from another detective "that the people inside [the Raymond Street house] were carrying guns inside of socks." Sergeant Forney further explained that he did not test the gun for fingerprints because the gun was contained inside of a sock and there "probably wouldn't have been [any fingerprints] on it." The sergeant testified that he was familiar with Ms. Tate. He knew that she had a criminal record that involved drugs and weapons possession. Sergeant Forney also believed that, based on his prior investigations of Ms. Tate for drug sales, she generally worked with other people in the drug trade.
 {¶ 39} Detective Schmidt also aided in executing the search warrant of the Raymond Street house. Before entering the house, he stopped two men, not parties to the present criminal action, from attempting to jump off the roof of the house. Upon searching the house, the detective found a paper napkin containing marijuana on the top of the stove. Additionally, another detective, Detective Gilbride, stated that when he entered the southwest bedroom, he "observed two males on the — on the roof of the porch, the overhang, and [he] observed two males lying face down on the bed"; other officers had secured the scene before he arrived. Detective Gilbride helped secure the two males, which he identified as Appellant and Mr. Riley, lying on the bed. Detective Gilbride searched Appellant and found $610 in Appellant's pants pocket. He also searched the room and found one shotgun between the mattress and box springs of the bed. The officer did not request that the gun undergo fingerprint or DNA analysis. Officer Keith Meadows, another member of the police unit that searched the Raymond Street house, apprehended Appellant's co-defendant, Mr. Riley, on the second floor of the house and conducted a pat down. The officer confiscated a wad of money from Mr. Riley's pants pocket.
 {¶ 40} Detective Male was another member of the SWAT team that entered the Raymond Street house on the night of June 25, 2003. He testified that after searching the house he found several plates with crack cocaine on them sitting in plain view in the southeast bedroom. The plates were located near a television. The plates were not confiscated, only the crack cocaine contained on the plates was taken as evidence. He explained that the plates contained approximately 15.6 grams of crack cocaine. Detective Male also testified that a baggie of marijuana was located next to the television, which was found near the plates of crack cocaine. Located in the same bedroom with the plates of crack and baggie of marijuana was a microwave, .38 caliber rounds and bullets, a walkie-talkie and a digital scale with "cocaine residue on the surface." The detective explained that a microwave could be used for "[c]ooking. Oftentimes it's used to cook crack cocaine." The detective further explained that walkie-talkies were used "[t]o alert drug dealers inside a location of [police] presence[.]"
 {¶ 41} Detective Male stated that he did not request DNA or fingerprint analysis on any of the items confiscated from the southeast bedroom. He explained that "well, we haven't done that as a common practice or procedure in my unit since I've been up there, given the surfaces of those materials, they're not conducive for lifting latents." The detective also admitted on cross-examination that he could not say with any certainty whether the items found in the southeast bedroom belonged to Appellant, Mr. Riley, or Ms. Tate.
 {¶ 42} Detective Jones, as the lead detective in the case, explained that he became involved with the case around the end of May 2003. He prepared the affidavit and search warrant for the Raymond Street house. The basis for the search warrant included: a prior drug robbery that occurred at a home previously rented by Ms. Tate; Ms. Tate's prior felony convictions for drugs; and documented surveillance of a controlled buy that occurred at the Raymond Street house. Detective Jones testified that when he entered the southwest bedroom of the Raymond Street house on June 25, 2003, he observed Appellant attempting to flee through an open window; Appellant was ordered back into the room by other officers and placed on a bed. The detective also observed two other males on the roof of the porch; they were ordered back into the house by police officers. When Detective Jones ventured onto the roof he found a sock containing a gun; bullets were in the chamber of the gun. The detective stated that he was unsure whether the gun belonged to one of the men on the roof or Appellant. Detective Jones was able to ascertain the identities of the men on the roof, but he was unable to learn the identities of the men on the bed, who were later identified as Appellant and Mr. Riley, because they refused to cooperate.
 {¶ 43} After the raid, on June 30, 2003, Detective Jones talked to Ms. Moss. He testified that Ms. Moss admitted that she sold drugs from her home and she told him that Ms. Tate owned a gun with a "red laser light." She also told the detective that "[t]hey all sell crack, Detroit Slim, Re, E, and J[,]" referring to Ms. Tate's boyfriend, Ms. Tate, Appellant, and Mr. Riley. Ms. Moss told Detective Jones that "J, aka [Appellant], would carry his gun inside a sock. She said E, aka Terrell Riley, would carry his gun with or without a sock." The officer further stated that during the course of his investigation none of the suspects or witnesses told him that Ms. Tate was calling people from Detroit to help her with repairs on a home she wanted to buy. The officer also testified on cross-examination that he seized a Polaroid photograph of Ms. Tate holding a 12-gauge shotgun.
 {¶ 44} Appellant did not present any witnesses. However, his co-defendant did. Detective Paul Bralek, an officer with the Akron Police Department, was called as a witness on behalf of Mr. Riley. Detective Bralek was assigned to the crimes against property division, which included "property recovery, trying to relocate stolen property, tracking firearms." His duties also included "transportation of evidence to and from [BCI] up in Richfield." Detective Bralek testified that he, along with another detective, transported several items (i.e., a Smith 
Wesson revolver, a Taurus revolver, a Colt revolver and a J.C. Higgins shotgun) confiscated from the raid on the Raymond Street house to BCI. Ms. Tate's name was listed as the only owner of the guns in the BCI evidence reports. However, the detective explained that several other reports listed the names of Appellant, Mr. Riley, Ms. Moss, and Ms. Tate as owners of the Smith Wesson revolver, the Taurus revolver, and the J.C. Higgins shotgun. Detective Bralek stated that DNA testing was not done on the weapons because the officers that submitted the evidence did not request such tests. He further explained that DNA testing did not occur because such tests were normally done when there was some type of substance on the gun, like bodily fluid, blood, or human tissue. The detective stated that none of the weapons submitted to BCI contained such genetic material. The detective further admitted that the serial numbers on the guns were never checked to determine actual ownership.
 {¶ 45} Mr. Riley, Appellant's co-defendant, testified in his own defense. He stated that he was a resident of Detroit, Michigan. Mr. Riley explained that he received his associate degree from Wayne University in Michigan and was in the army for approximately two-and-a-half years. He testified that he came to the Raymond Street house because he received a phone call from his cousin and Appellant's brother-in-law, Freddy Williams, Jr., around 9:00 a.m. on the morning of June 25, 2003. Mr. Williams told Mr. Riley that he was interested in moving to Akron, Ohio. Mr. Riley explained:
"[My cousin] said he contacted this person. Her name was Marie. And he said that she was going to sell him a house, and she knew somebody who was going to help him buy a house.
"[My cousin] asked me if I would come down here and would I look over the house and see what was wrong with it and come back up there and tell him the problems wrong with the house, how much I would charge for me to fix them, and that's basically it."
 {¶ 46} Mr. Riley further explained that he had experience with construction and remodeling. His father owned a construction business for eight-and-a-half years and he had "been in [the construction business] since [he] was about 13 or 14." After talking to his cousin, Mr. Riley and Appellant took a Greyhound bus to Akron, Ohio. They arrived in Akron around 5:10 p.m. the afternoon of June 25, 2003, and were picked up from the bus station by Ms. Fleming and a man named Donald Adams. Both men were taken to a house located at 696 Raymond Street, which was a couple of houses down from the Raymond Street house. While at the house on 696 Raymond Street, Mr. Riley met Ms. Tate. Ms. Tate gave him a tour of the inside of the house, which lasted thirty to forty minutes. Mr. Riley explained that because he intended to take a bus back to Detroit that night, he did not have a place to stay, so Ms. Tate took him to the Raymond Street house where he "dozed off" on the couch in the living room. He was later told by Ms. Fleming to "[g]o upstairs and lay down," which he did in the southwest bedroom of the house. When he woke up "there was a gun in [his] face."
 {¶ 47} Mr. Riley denied that he owned or ever came into contact with the guns confiscated from the Raymond Street house. He further denied that he lived in the same room where the television, which was found sitting next to the plate containing crack cocaine and the baggie of marijuana, was located. Mr. Riley denied selling or possessing drugs. He also testified that he had a Greyhound bus ticket in his pants pocket the night he was arrested, but he explained that it was confiscated by the police and never returned.
 {¶ 48} On cross-examination, Mr. Riley stated that he met Ms. Moss in Detroit a week before he came to Akron. He stated that he did not get much information about Ms. Moss while she was in Detroit. Mr. Riley further explained that he did not know he was in Ms. Moss' home when he was arrested on June 25, 2003. Mr. Riley stated that there was no animosity between himself and Ms. Moss or Ms. Fleming, but he believed they were lying about his involvement with the illegal sale of drugs "[b]ecause both of them were charged with this exact same case, and you told [Ms. Moss] that if she didn't testify against us that you would keep her children away from her." Mr. Riley testified that Ms. Moss and Ms. Fleming wrote him letters telling him that they were threatened by the prosecutor; Mr. Riley failed to bring the letters to court to corroborate his story and the letters were never submitted as evidence. Mr. Riley admitted, however, that he never heard the prosecutor tell Ms. Moss that she should perjure herself in order to retain custody of her children. Mr. Riley also explained that Ms. Tate never personally called him to drive to Akron to repair a house she intended to buy. He stated that he did not meet Ms. Tate until he arrived in Akron, Ohio, on June 25, 2003.
 {¶ 49} Based on the defense counsel's line of questioning at trial, it appears that the defense was attempting to show that the sole purpose Appellant was in the Raymond Street house was not to sell drugs, but because Ms. Tate asked him to come to Akron to help her repair a home that she intended to buy. It was within the jury's discretion, however, to disbelieve this theory. "The jury is the sole judge of the weight of the evidence and the credibility of witnesses." State v. Antill (1964),176 Ohio St. 61, 67; see, also, State v. Walker (1978), 55 Ohio St.2d 208,212, certiorari denied (1979), 441 U.S. 924, 99 S.Ct. 2033,60 L.Ed.2d 397. This is because the jury is in the best position to view the witnesses' testimony and adjudge their credibility.State v. Aaron, 9th Dist. No. 21434, 2003-Ohio-5159, at ¶ 17. This Court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless we conclude that the factfinder clearly lost its way. State v. Urbaytis
(1951), 156 Ohio St. 271, 278.
 {¶ 50} Here, the State presented evidence that, if believed, proved Appellant possessed the guns confiscated from the Raymond Street house; that he, along with Mr. Riley and Ms. Tate, controlled what went on inside the Raymond Street house; and that he helped Ms. Tate sell crack cocaine. Ms. Fleming, although an admitted drug addict, testified that she occasionally saw Appellant carrying a gun in a sock and that he lived in the southeast bedroom of her house where drug paraphernalia, crack cocaine, and marijuana were found. Ms. Moss, while occasionally absent from the Raymond Street house, also testified that Appellant sold drugs from her home. The officers that conducted the search of the Raymond Street house testified that they found crack cocaine, marijuana and drug paraphernalia in the bedroom that, according to Ms. Fleming, Appellant lived in. Based on the evidence presented at trial, this Court finds that the evidence does not weigh heavily against the judgment and the trial court did not create "such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Otten,33 Ohio App.3d at 340. Appellant's second assignment of error is not well taken.
 III {¶ 51} Appellant's first and second assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Slaby, J., Concurs.
[1] The trial court instructed the jury on the principal charge of: possession of cocaine, illegal use or possession of drug paraphernalia, and possession of marijuana. In addition, the jury was instructed on complicity to the offense of possession of cocaine and complicity of the offense of illegal use or possession of drug paraphernalia. Although the indictment fails to charge Appellant with complicity pursuant to R.C. 2923.03(F), the indictment is not constitutionally infirm. R.C. 2923.03(F) provides that a charge of complicity may be stated in terms of the statute or in terms of the principal offense. As such, Appellant was properly convicted of the complicity offenses even though the indictment stated only the principal offense and did not mention complicity. State v. Tobias, 1st Dist. No. C-020261, 2003-Ohio-2336, at ¶ 26; see, also, State v. Herring
(2002), 94 Ohio St.3d 246, 251, certiorari denied (2002),537 U.S. 917, 123 S.Ct. 301, 154 L.Ed.2d 202.
[2] Ms. Tate was also indicted on the same charges as Appellant. However, at the time of trial, Ms. Tate was not in custody because the police could not locate her.