DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Defendant/Appellant appeals his conviction by the Summit County Court of Common Pleas. We affirm.
 {¶ 2} On April 26, 2007, Defendant was indicted for one count of having weapons while under disability in violation of R.C. 2923.13(A)(2) and (A)(3), a third-degree felony; one count of illegal use and possession of drug paraphernalia in violation of R.C. 2925.14(C)(1), a fourth-degree misdemeanor; and one count of possession of marijuana in violation of R.C. 2925.11(A), a minor misdemeanor for conduct occurring on April 13, 2007. Defendant pled not guilty to all charges and on July 12, 2007, the matter proceeded to trial to a jury on counts one and two *Page 2 
and trial to the bench on count three. On July 16, 2007, Defendant was convicted on count one and acquitted on counts two and three. On January 28, 2008, the trial court issued its judgment entry, which complied with Crim.R. 32, and which sentenced Defendant to two years imprisonment ("Judgment Entry").
 {¶ 3} A brief summary of the facts is necessary to provide context to Defendant's assignments of error and the discussion thereof. On April 13, 2007, Akron police responded to a 911 call about domestic violence at 63 N. Balch Street ("premises"). Upon arrival, the police spoke to Quashiema Harrison ("Harrison"), who rented a room at 63 N. Balch Street from Cecelia Burnette (Defendant's girlfriend, hereinafter "Burnette"). Harrison informed them that Defendant had hit her in the face several times. There was not a domestic relationship between Harrison and Defendant and after investigating, the police found no evidence to justify an immediate arrest and left ("first incident"). Harrison left the premises after the first incident but returned shortly thereafter in the company of four individuals, including two individuals who testified at trial, Santino Boddie ("Boddie") and Takashamaya Robinson ("Robinson"). Harrison, Boddie and Robinson testified that, upon their arrival at the premises, Defendant pulled out a gun. The three left and called 911 from another location ("second incident"). Police responded to the 911 call of the second incident, spoke to various witnesses, found a gun under the mattress in the bedroom of 63 N. Balch Street and arrested Defendant. *Page 3 
 {¶ 4} Defendant timely appealed the Judgment Entry and raises six assignments of error.
 First Assignment of Error "The trial court erred and abused its discretion in allowing in the testimony of a witness whose identity was disclosed three days before trial, but neither contact information, nor the proper spelling of her name, was ever disclosed prior to trial."
 Second Assignment of Error "The trial court erred and abused its discretion in allowing in the testimony of a witness whose identity was never disclosed prior to trial."
 Third Assignment of Error "The trial court erred and abused its discretion in allowing in the evidence of a recorded 911 tape that was never disclosed before trial."
 {¶ 5} Defendant asserts that the trial court erred in allowing three pieces of evidence to be admitted at trial in violation of Crim.R. 16(B)(1)(e) and (f). Specifically, Defendant challenges the trial court's decision to allow (1) the testimony of Robinson where Robinson's name was not disclosed to defense counsel until July 6, 2007, and Robinson's correctly spelled name and contact information were not disclosed until July 9, 2007 where trial was set to begin on July 12, 2007; (2) the testimony of Boddie where Boddie's name was not disclosed to defense counsel until the day of trial; and (3) a recording of a 911 call made by Robinson to report the second incident ("Robinson call") where the existence of the tape was not made known to defense counsel until the morning of *Page 4 
trial. Defendant asserts that the State's violation of Crim.R. 16 was willful; that knowledge of the information would have helped the defense; and that Defendant was prejudiced by the non-disclosures. Defendant further maintains that if this Court determines that defense counsel did not preserve a particular issue for appeal, there was plain error. Because the law is substantially the same for each of Defendant's first three assignments of error, they will be discussed together.
 {¶ 6} "We review the trial court's admission or exclusion of evidence for an abuse of discretion." State v. Travis, 9th Dist. No. 06CA0075-M,2007-Ohio-6683, at ¶ 24, citing State v. Apanovitch (1987),33 Ohio St.3d 19, 22. "An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling." Travis at ¶ 24, citing Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. In applying the abuse of discretion standard, the appellate court does not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd.
(1993), 66 Ohio St.3d 619, 621.
 {¶ 7} Crim.R. 16(B)(1)(e) and (f) state, in relevant part:
 "(B) Disclosure of evidence by the prosecuting attorney
 "(1) Information subject to disclosure
 * * *
 "(e) Witness names and addresses; record. Upon motion of the defendant, the court shall order the prosecuting attorney to furnish to the defendant a written list of the names and addresses of all witnesses whom the prosecuting attorney intends to call at trial[.] * * * Names and addresses of witnesses shall not be subject to disclosure if the prosecuting attorney certifies to the court that to do *Page 5 
so may subject the witness or others to physical or substantial economic harm or coercion.
 "(f) Disclosure of evidence favorable to defendant. Upon motion of the defendant before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment. The certification and the perpetuation provisions of subsection (B)(1)(e) apply to this subsection."
 {¶ 8} Crim.R. 16(E)(3) states:
 "(3) Failure to comply. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."
 {¶ 9} "Prosecutorial violations of Crim.R. 16 are reversible only when there is a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." State v. Joseph
(1995), 73 Ohio St.3d 450, 458, citing State v. Parson (1983),6 Ohio St.3d 442, 445.
 {¶ 10} We will now discuss each piece of evidence Defendant asserts was improperly admitted due to the State's violation of Crim.R. 16.
 Robinson's Testimony *Page 6 {¶ 11} Defendant asserts that the State violated Crim.R. 16(B)(1)(e) because he was not advised that Robinson would be testifying at trial until the Friday prior to the Thursday trial date. Defendant further maintains that he was not advised of the correct spelling of Robinson's first name until the Monday before the Thursday trial date. Counsel for the State asserts that it made defense counsel aware that Robinson would be a witness "as soon as he learned about Robinson" from Harrison. Robinson's name was not contained in the State's file prior thereto because she had not been interviewed by the police. The State maintains that even though the parties discussed the issue of Robinson with the trial court prior the start of trial, Defendant did not: (1) move for a continuance; (2) indicate that he was not aware of the nature of Robinson's testimony; (3) claim that Robinson's testimony was exculpatory; or (4) move the court to exclude Robinson's testimony. Moreover, defense counsel did not object when the State called Robinson to testify.
 {¶ 12} We hold that Defendant forfeited any error with regard to Robinson's testimony as he did not object when Robinson took the stand to testify and/or at any time during her testimony on the grounds of a Rule 16(B) violation. State v. Boyd, 9th Dist. No. 22151, 2005-Ohio-73, at ¶ 6. See also, State v. Wade, 9th Dist. No. 02CA0076-M, 2003-Ohio-2351, at ¶ 44 (finding waiver of a Crim.R. 16(B)(1)(d) error where counsel did not object to the evidence when admitted at trial). Because defense counsel did not bring the alleged discovery violation to the *Page 7 
trial court's attention when Robinson took the stand to testify, Defendant has forfeited any error, unless allowing Robinson to testify under the circumstances of this case rise to the level of plain error. Crim.R. 52(B). See, State v. Cunningham, 103 Ohio St.3d 197,2004-Ohio-7007, at ¶ 47-48 (finding that defendant waived a Crim.R. 16(B)(1)(g) error for all but plain error where counsel did not preserve the issue for appellate review). See also, State v. Penland (1998),132 Ohio App.3d 176, 187 (holding that all but plain error was waived for violation of Crim.R. 16(B)(1)(c) where defendant failed to bring discovery violation to trial court's attention).
 {¶ 13} "By its very terms, [Crim.R. 52(B)] places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be `plain' within the meaning of Crim.R. 52(B), an error must be an `obvious' defect in the trial proceedings. Third, the error must have affected * * * the outcome of the trial." State v. Barnes (2002),94 Ohio St.3d 21, 27. We notice plain error only in exceptional circumstances to prevent a manifest miscarriage of justice. SeeState v. Long (1978), 53 Ohio St.2d 91, 97.
 {¶ 14} Defendant cannot meet the first element of the plain error test as the trial court's admission of Robinson's testimony despite the State's failure to advise defense counsel of Robinson's name until 6 days prior to trial and the *Page 8 
spelling of name until 3 days prior to trial is not an error, or a deviation from the legal rule. "The Ohio Supreme Court has acknowledged that in the absence of a motion for a continuance, a trial court does not abuse its discretion by not striking the testimony and proceeding with the trial." State v. Blankenship (Dec. 9, 1998), 9th Dist. No. 18871, at *7, quoting State v. Edwards (1976), 49 Ohio St.2d 31, 42-43, vacated on other grounds. Here, Defendant failed to move the trial court for a continuance upon learning that Robinson would testify. Therefore, "the trial court did not abuse its discretion, much less commit plain error, by permitting" the testimony and proceeding with the trial. SeeState v. Merchant (Feb. 19, 1997), 9th Dist. No. 96CA006334, at *4.
 Boddie's Testimony {¶ 15} Defendant asserts that the State did not disclose Boddie's name to him as a witness until the morning of trial in violation of Crim.R. 16(B)(1)(e). Accordingly, Defendant maintains, the trial court erred in allowing Boddie to testify. As with Robinson, Defendant failed to object when Boddie took the stand to testify. In fact, defense counsel never discussed the issue of Boddie's testimony with the trial court at all. Defense counsel failed to file a motion for continuance, seek to exclude Boddie's testimony, or assert, prior to appeal, that Boddie's testimony was exculpatory and/or that Defendant was prejudiced by the State's failure to disclose Boddie as a witness prior to the morning of trial. For the reasons set forth in our discussion of Robinson, we hold that Defendant forfeited *Page 9 
any error related to the admission of Boddie's testimony and the trial court did not commit plain error in so admitting it.
 Robinson Call {¶ 16} On appeal Defendant asserts that the State violated Crim.R. 16(B)(1)(f) where it failed to disclose the existence of the Robinson call until the morning of trial and that, accordingly, the trial court erred in admitting the Robinson call. Defendant maintains that the Robinson call was "potentially exculpatory" and that had he been aware of its existence, "he would have been better able to prepare his strategies for trial, make an intelligent decision to either testify on his own behalf or remain silent, as well as properly review any Rule 11 pretrial negotiations or decide whether to proceed to trial." Defendant further maintains that he "was not able to prepare a proper cross-examination of the witness Robinson that included information that could only be obtained from the Robinson 911 tape." The State asserts that defense counsel heard the Robinson call before trial began and that "the tape was played for defense counsel as soon as it was practical for the prosecutor (keeping in mind that the prosecutor had received the tape at 3:40 p.m. the prior day)" and that the prosecutor did not get Defendant's case until the week prior to trial. The State finally argues that Defendant fails to assert how the tape was exculpatory, how his strategy might have changed and/or what additional questions he would have posed to Robinson on cross-examination had he had a longer time to review the three minute tape. *Page 10 
 {¶ 17} As with Robinson, defense counsel argued prior to trial commencing that he had been surprised by the existence of the Robinson call and asked the trial court to exclude the tape. However, Defendant did not object when the Robinson call was played during Robinson's direct examination. Accordingly, as set forth in our discussion above, Defendant forfeited all but plain error as to the trial court's admission of the Robinson call.
 {¶ 18} We also hold that there was no plain error in admitting the Robinson call at trial. During the Robinson call, both Robinson and Harrison's voices are heard and Harrison advises the dispatcher that Defendant had a gun. Defendant has not asserted and this Court cannot determine how the Robinson call could be in any way exculpatory, thereby making any alleged delay in producing the tape an error under Crim.R. 16(B)(1)(f). Both Robinson and Harrison testified at trial that Defendant had a gun. Without an error, there can be no plain error. SeeBarnes, 94 Ohio St.3d at 27.
 {¶ 19} Defendant's first, second and third assignments of error are overruled.
 Fourth Assignment of Error "The misconduct by the state of intentionally hiding exculpatory evidence until the close of its case prevented [Defendant] from enjoying a fair trial." *Page 11 
 {¶ 20} Defendant asserts that the State engaged in prosecutorial misconduct by engaging in the conduct described in his first three assignments of error in violation of Crim.R. 16(B).
 {¶ 21} In State v. Williams, 9th Dist. No. 21840, 2004-Ohio-4316, we stated:
 "The Supreme Court of Ohio has limited the instances when a judgment may be reversed on grounds of prosecutorial misconduct. See State v. Lott (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293, certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 596. The analysis of cases alleging prosecutorial misconduct focuses on the fairness of the trial and not the culpability of the prosecutor. Id. A reviewing court is to consider the trial record as a whole, and is to ignore harmless errors `including most constitutional violations.' Id., quoting United States v. Hasting (1983), 461 U.S. 499, 508-509, 103 S.Ct. 1974, 76 L.Ed.2d 96, certiorari denied (1985), 469 U.S. 1218, 105 S.Ct., 84 L.Ed.2d 343. Accordingly, a judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial. State v. Carter (1995), 72 Ohio St.3d 545, 557, 651 N.E.2d 965, citing State v. Apanovitch (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394." Williams at ¶ 6.
 {¶ 22} Here, as in Williams, Defendant argues that the State committed prosecutorial misconduct when it failed to abide by the discovery rules by failing to timely present certain evidence to Defendant. Defendant contends that the State's failure to provide him with this evidence prevented him from having a fair trial.
 {¶ 23} In Williams, we held:
 "In reviewing prosecutorial violations of the discovery rule, this Court looks at the Ohio Supreme Court decision in State v. Joseph (1995), 73 Ohio St.3d 450, 653 N.E.2d 285, certiorari denied (1996), *Page 12 516 U.S. 1178, 116 S.Ct. 1277, 134 L.Ed.2d 222. In Joseph, the court explained that the State's failure to provide discovery will not amount to reversible error unless there is a showing that `(1) the prosecution's failure to disclose was a willful violation of [Crim. R. 16], (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect.' (Alterations sic.) Id. at 458, 653 N.E.2d 285, citing State v. Parson
(1983), 6 Ohio St.3d 442, 453 N.E.2d 689." Williams at ¶ 8.
 {¶ 24} We have already decided that the State did not willfully violate the discovery rules. Moreover, assuming arguendo, that we held otherwise, "Defendant has failed to satisfy the three-part test set forth in Joseph. That is, he has failed to demonstrate that foreknowledge of the existence of the evidence would have benefited him or that he suffered prejudice as a result of the State's failure to provide him with the evidence." Williams at ¶ 8.
 {¶ 25} Defendant's fourth assignment of error is overruled.
 Fifth Assignment of Error "The convictions (sic) should be reversed because they (sic) are against the manifest weight of the evidence and because the evidence supporting them was insufficient as a matter of law to prove the conviction beyond a reasonable doubt in violation of the United States Constitution."
 {¶ 26} In his fifth assignment of error, Defendant asserts that his conviction was against the manifest weight of the evidence and not supported by sufficient evidence. Specifically, Defendant maintains that both he and Burnette testified that Defendant was unaware of the presence of the gun, which was owned by Burnette, and that Defendant did not use the gun. Defendant further maintains that *Page 13 
the evidence at trial made clear that Harrison "had a motive and a strong desire to see that [Defendant] faced a potential criminal allegation of some significance" because Defendant was not arrested after the first incident. Defendant finally maintains that all of the State's witnesses were related to Harrison and therefore biased against him and that their testimony about the incident was "inconsistent in significant ways." We disagree.
 {¶ 27} "When reviewing the trial court's denial of a Crim.R. 29 motion, this court assesses the sufficiency of the evidence `to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" State v.Flynn, 9th Dist. No. 06CA0096-M, 2007-Ohio-6210, at ¶ 8, quotingState v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. In applying this standard, we view the evidence in the light most favorable to the prosecution. Jenks, 61 Ohio St. 259 at paragraph two of the syllabus; State v. Feliciano (1996), 115 Ohio App.3d 646, 653. "In essence, sufficiency is a test of adequacy." State v. Thompkins (1997),78 Ohio St.3d 380, 386.
 {¶ 28} "While the test for sufficiency requires a determination of whether the [S]tate has met its burden of production at trial, a manifest weight challenge questions whether the [S]tate has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citing Thompkins, *Page 14 78 Ohio St.3d at 390 (Cook, J., concurring). In assessing a challenge to the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
"This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant." Flynn at ¶ 9, citing Otten at 340.
 {¶ 29} Moreover, "[b]ecause sufficient evidence is required to take a case to the jury, the conclusion that a conviction is supported by the weight of the evidence necessarily includes a finding of sufficiency."Flynn at ¶ 10, citing State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2. "Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." Roberts at *2.
 {¶ 30} Based on a review of the record, this Court finds it reasonable that the jury could have believed the testimony and evidence proffered by the State and convicted Defendant. The jury heard the testimony of ten witnesses, eight on behalf of the State and two on behalf of Defendant.
 {¶ 31} Defendant was convicted of having weapons while under disability in violation of R.C. 2923.13(A)(2) and (A)(3), which state: *Page 15 
 "(A) Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
 * * *
 "(2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.
 "(3) The person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been an offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse."
Defendant stipulated as to his prior conviction for robbery and that such was a crime of violence.
 {¶ 32} Officer Van Nostran responded to both the first and second incidents on April 13, 2007. Van Nostran testified that in response to the first incident, he spoke with both Harrison and Defendant about an alleged physical altercation between them. Van Nostran indicated that because the stories of each party were conflicting, there were no physical findings (other than a small cut inside Harrison's upper lip), and there was no domestic relationship between Harrison and Defendant, he simply advised the parties to go their separate ways and left the scene. He testified that Harrison indicated that she was going to leave. *Page 16 
 {¶ 33} Van Nostran returned to the scene about an hour later in response to a 911 call about a fight with weapons. Van Nostran explained that, upon arrival at the premises, he spoke with Harrison and Boddie, who informed them that Defendant was inside the premises with a gun. Van Nostran indicated that he knocked on the door and Burnette came out, followed by two men, one of whom was Defendant. Burnette, Defendant and the other man told police there was a gun in the house underneath a mattress. Other officers entered the home and secured the gun. Van Nostran testified that he saw the gun and two ammunition magazines lying on a box spring prior to their removal from the home.
 {¶ 34} Van Nostran indicated that Burnette told him two different versions of the events that night. She first indicated that someone came into the house and asked who hit Harrison, after which Burnette said she left the room to take a shower. In the second rendition, Burnette told them that Harrison and company left the apartment after asking who hit Harrison, after which Burnette indicated she went to take a shower. In neither story was a gun mentioned. Van Nostran testified that Defendant was ultimately arrested.
 {¶ 35} Harrison testified that on April 13, 2007, she lived in the home at 63 N. Balch with her boyfriend, Defendant and Burnette. Harrison testified that she and Defendant argued that evening and that Defendant hit her once in the mouth and once in the chin. Harrison stated that Burnette pulled Defendant away from her. Harrison stated that she called 911 from her mother's house and came back to *Page 17 
the premises with two cousins to await police. Harrison explained that when the police did not arrest Defendant, she again left the premises and went back to her mother's home.
 {¶ 36} Harrison explained that she returned to the premises shortly thereafter to remove her belongings from the house accompanied by four of her cousins who were there to protect her. Only Boddie and Robinson entered the house with her. Harrison explained that when they came in the house, Boddie asked her who hit her and she pointed to Defendant after which Defendant said, "Who wants to know?" and pulled out a gun and pointed it at the group. Harrison testified that the group then left the house and Robinson called police. Harrison maintained that while the group was outside and Robinson was on the phone calling 911, Defendant came out of the house with the gun still in his hand and saw them on the phone. Harrison testified that she also spoke to the 911 dispatcher during the Robinson call and gave her Defendant's name.
 {¶ 37} Harrison finally testified that she and her family waited for the police behind a tree and spoke to police upon their arrival. Harrison identified the gun, her voice on the recording of the Robinson call, and Defendant.
 {¶ 38} On cross-examination, Harrison testified that she knew Defendant had a felony record and that there was a gun in the house at 63 N. Balch because Defendant "carries it on him." *Page 18 
 {¶ 39} Robinson testified that on April 13, 2007, she accompanied Harrison to the premises so that Harrison could pick up clothing she had at the premises. Robinson explained that when she, Harrison and Boddie arrived, she asked Defendant, who was sitting on the couch, what had happened between him and Harrison. Harrison explained that she then looked down and saw a gun lying next to Defendant on the couch and Defendant had his hand on the gun. Defendant did not pick up and point the gun. Robinson stated that she then told her cousins to get out of the house and they left. Robinson testified that she made the Robinson call on her cell phone. Robinson indicated that she never saw Burnette while at the premises. Robinson testified that she did not see anyone come out of the house until the police arrived. Robinson identified her own voice on the Robinson call, the gun, and Defendant.
 {¶ 40} Boddie testified that on April 13, 2007, he was at his girlfriend's house when Harrison arrived "crying and screaming" and indicating that a guy had hit her. Boddie said that Harrison called the police and then went down to meet them. Boddie explained that Harrison is not his cousin, but is his girlfriend's sister and he considers himself Harrison's brother. When Harrison returned from meeting the police after the first incident, Boddie suggested to her that she not stay at the apartment anymore and offered to accompany her back to pick up her clothes. Boddie testified that he, Robinson, and Harrison went to the premises. While Harrison was gathering her clothes, Boddie testified that he smelled *Page 19 
marijuana and saw a man sitting on a chair and a woman and young boy also in the room. Boddie explained that he asked "Who hit my sister?" Harrison identified Defendant to him and Defendant then said, "Who wants to know" and pulled a gun. Boddie testified that he asked Defendant, "You're going to shoot me?"
 {¶ 41} Boddie, Harrison, and Robinson then left the house, explained Boddie, and Robinson and Harrison called 911. Boddie testified that he also made a separate call to 911 to report being threatened with the gun.[1] Boddie finally testified that he did not see anyone come out of the house until police arrived. Boddie identified the gun and Defendant.
 {¶ 42} Officer Long was Van Nostran's partner on April 13, 2007. Long's testimony of both the first and second incident supported that of Van Nostran. Long also testified that he was one of the first officers to enter the premises and secure it.
 {¶ 43} Long testified that he spoke with Burnette at the scene and she told him Harrison came into the house using her key with a group of people, one of whom had a bat. Harrison stated that Burnette told him the guy with the bat asked *Page 20 
who had hit Harrison, after which Defendant pulled out a gun and Harrison and her party left.
 {¶ 44} Long testified that Defendant told him that he and Burnette were sitting on the couch when a bunch of people came into the apartment, one of whom had a baseball bat, after which Defendant requested an attorney and the interrogation stopped. Long indicated that neither he or any other officer found a baseball bat at the scene or nearby. Ultimately, Long stated that he arrested Defendant because Defendant had a prior felony conviction, which precluded him from possessing a firearm. Long identified Defendant in the courtroom.
 {¶ 45} Jonathan Gardner, an employee of BCI, testified that the gun at issue on April 13, 2006, was operable and identified his report. Gardner explained that BCI no longer conducts fingerprint analysis of firearms because the result of such analysis is poor. Instead, Gardner explained BCI tests firearms for DNA if requested. No such request was made in this case.
 {¶ 46} Officer Tim Wypasek was a responding police officer on April 13, 2007, to the second incident. He and his partner responded as back-up to Long and Van Nostran. When he arrived, Wypasek stated, he entered the home to secure the scene and find the gun. Wypasek testified that he found the gun under a mattress in a bedroom. He identified the gun in the courtroom and the picture he took of the gun and spare magazines. Wypasek also testified that he "clear[ed] the firearm." In so doing, he found the gun to be fully loaded with a round in the *Page 21 
chamber. Wypasek indicated that he gave the weapons to Long to tag into evidence.
 {¶ 47} For the defense, Burnette testified that on April 13, 2007, she was Defendant's girlfriend and that Defendant lived at 65 N. Balch Street, the apartment directly above the premises. Burnette testified that she witnessed the first incident and did not see Defendant strike Harrison. Burnette stated that when the police did not arrest Defendant as a result of the first incident, Harrison made threats stating, "It's not over. You're going to get you're A-S-S beat." Burnette indicated that Harrison then left and she got in the shower.
 {¶ 48} Burnette explained that while she was getting dressed after her shower, she heard a commotion in the living room. Burnette stated that she peaked out of the bedroom and saw three people in the room, including Harrison, Robinson, and Boddie, the latter of whom had a bat in his hand. She heard Boddie ask who hit his sister, and Defendant respond, "What the `F, `" after which she closed the door to get dressed. When she came out of her room, everyone was outside and Defendant was standing in the doorway. Burnette testified that she never saw Defendant with a gun. She did not see all of the events in the living room that were part of the second incident.
 {¶ 49} Burnette testified that she purchased the gun and identified the price tag and receipt for the gun. She explained that she never kept a clip in the gun, Defendant did not know she had a gun, and neither she nor Defendant removed the *Page 22 
gun that evening. Burnette denied ever telling a police officer that Defendant had a gun in his hand that night or that she was sitting on the couch when Harrison and company arrived. Finally, Burnette admitted to refusing to make a written statement on April 13, 2007, asserting that she was told that the statement could be used against her.
 {¶ 50} Defendant testified in his own behalf. He acknowledged his prior romantic relationship with Burnette and that he knew Harrison because she lived with Burnette on April 13, 2007, and dated Burnette's brother. Defendant stated that Harrison and Burnette and everyone in their group knew he was a felon. Defendant identified various exhibits to demonstrate that he lived at 65 N. Balch Street, rather than with Burnette at the premises on or near April 13, 2007. Defendant denied that he heard Harrison make a threat after the first incident but stated that she was angry.
 {¶ 51} When Harrison came back to the premises after the first incident, Defendant explained, Burnett was in the shower and he was sitting on the couch with a neighborhood kid. Defendant explained that he heard the door slam open hard and heard footsteps. He next heard someone ask, "who hit my cousin?" Defendant testified that he then saw Boddie standing in front of him with a bat in his hand and a room full of people behind him. Defendant explained that he got "bossed up" (aggressive), loud and paced in front of them trying to intimidate them. Defendant denied having a gun. Defendant stated that eventually the group *Page 23 
left probably because "it dawned on them that they just came in somebody's home with a bat[.]" Defendant explained that the whole incident took two or three minutes. Defendant finally testified that he did not know Burnette owned a gun.
 {¶ 52} Rebuttal witness Brad Doerfler testified that he owned the properties at 63 and 65 N. Balch Street. Doerfler explained that Defendant was a tenant at 65 N. Balch Street until November 2006, although his name was not on the lease. The property was officially rented by Defendant's roommate. Doerfler testified that he did receive rent payments from Defendant and that he gave him receipts. Doerfler stated that Defendant was not a tenant at 65 N. Balch Street in March of 2007. Doerfler explained that from November 2006 to March of 2007, 65 N. Balch Street was vacant after which it was leased to another individual.
 {¶ 53} Based on the foregoing, we cannot conclude that the jury lost its way in finding that Defendant, a convicted felon, acquired, had, carried, or used a firearm on April 13, 2007. Although the State's lay witnesses' testimony was not identical as to the events of April 13, 2007, "the resolution of these inconsistencies is primarily for the trier of fact[.]" State v. Mclntyre (May 27, 1992), 9th Dist. No. 15348, at *6, citing State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 54} Defendant's fifth assignment of error is overruled. *Page 24 
 Sixth Assignment of Error "The cumulative effect of the errors produced a trial setting that was fundamentally unfair, thereby denying [Defendant] due process of law. U.S. Const. Amend. XIV; Section 16, Article I, Ohio Const."
 {¶ 55} In his final assignment of error, Defendant alleges that the errors in his case collectively amounted to cumulative error and deprived him of a fair trial. To support a claim of cumulative error, however, there must be multiple instances of harmless error. State v.Garner (1995), 74 Ohio St.3d 49, 64. "Cumulative error is irrelevant without some finding of individual error." State v. Downing, 9th Dist. No. 22012, 2004-Ohio-5952, at ¶ 69. Because we have found no error in Defendant's first five assignments of error, the doctrine of cumulative error is inapplicable here. Defendant's sixth assignment of error is overruled
 {¶ 56} Each of Defendant's assignments of error is overruled and the judgment of the Summit County Court of Common Pleas is affirmed.
Judgment Affirmed.
The Court finds that there were reasonable grounds for this appeal. We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into *Page 25 
execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
WHITMORE, J. DICKINSON, J. CONCUR.
[1] State's Exhibit 4, which is the Robinson call tape, contains only the voices of Robinson and Harrison, not Boddie. A tape of Boddie's alleged call to 911 was not introduced at the trial. *Page 1